UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 10-80059-CR-MIDDLEBROOKS

UNITED STATES OF AMERICA

vs.

VERONICA MARTINEZ,

    Defendant.
_____/

## PLEA AGREEMENT

The United States of America and Veronica Martinez (hereinafter referred to as the "defendant") enter into the following agreement:

    1.    The Charges to Which the Defendant Is Pleading Guilty: The defendant agrees to plead guilty to Counts 1, 3, 5 and 6 of the Indictment.

        a.    Count 1 charges that in or around the Spring of 2009, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant did knowingly bring to the United States an alien, that is L.M., knowing that such person was an alien, at a place other than a designated point of entry and at a place other than as designated by the Commissioner of the Immigration and Naturalization Service or the Secretary of Homeland Security, regardless of whether such alien has received prior official authorization to come to, enter or reside in the United States, and regardless of any future official action which may later be taken with respect to such alien; in violation of Title 8, United States Code, Section 1324(a)(1)(A)(i), and Title 18, United States Code, Section 2.

1

b.   Count 3 charges that in or around July of 2009, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant did knowingly bring to the United States an alien, that is E.M., knowing that such person was an alien, at a place other than a designated point of entry and at a place other than as designated by the Commissioner of the Immigration and Naturalization Service or the Secretary of Homeland Security, regardless of whether such alien has received prior official authorization to come to, enter or reside in the United States, and regardless of any future official action which may later be taken with respect to such alien; in violation of Title 8, United States Code, Section 1324(a)(1)(A)(i), and Title 18, United States Code, Section 2.

c.   Count 5 charges that from in or around July 2009, through on or about March 23, 2010, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant did knowingly provide and obtain the labor and services of a person, that is, E.M., by means of: (1) threats of serious harm to E.M. and another person; (2) the threatened abuse of law and the legal process; (3) a scheme intended to cause E.M. to believe that, if E.M. did not perform such labor and services, that E.M. and another person would suffer serious harm; and (4) any combination of these; in violation of Title 18, United States Code, Sections 1589(a) and 2.

d.   Count 6 charges that from in or around July 2009, through on or about March 23, 2010, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant did knowingly provide and obtain the labor and services of a person, that is, L.M., by means of: (1) threats of serious harm to L.M. and another person;

2

(2) the threatened abuse of law and the legal process; (3) a scheme intended to cause L.M. to believe that, if L.M. did not perform such labor and services, that L.M. and another person would suffer serious harm; and (4) any combination of these; in violation of Title 18, United States Code, Sections 1589(a) and 2.

2. In exchange for the defendant's guilty plea, the government agrees to move at the time of sentencing to dismiss Counts 2, 4, 7 and 8 of the Indictment.

3. The Elements of the Offense of Conviction: The elements of the offense of Alien smuggling, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(i), as charged in Counts 1 and 3 of the Indictment, are as follows:

> First: That the Defendant knowingly brought into the United States the person named in the indictment;
>
> Second: That such person was then an alien;
>
> Third: That the Defendant knew such person to be an alien; and
>
> Fourth: The entry was not made at a designated port of entry.

The elements of the offense of Forced Labor, in violation of Title 18, United States Code, Section 1589(a), as charged in Counts 5 and 6 of the Indictment, are as follows:

> First: That the Defendant provided or obtained the labor or services of the person named in the indictment;
>
> Second: That the defendant did so through at least one of the following prohibited means;
>
> > a) Through threats of serious harm to the person or any other person; or
> > b) Through a scheme, plan or pattern intended to cause the person to believe that failure to perform the labor or services

3

                would result in serious harm to that person or another person; or

        c)        Through the abuse or threatened abuse of the law or legal process; and

<u>Third</u>:        That the Defendant acted knowingly.

4.        Statutory Penalties: The defendant also understands and acknowledges that the Court may impose a maximum sentence on Counts 1 and 3 of up to 10 years' imprisonment to be followed by a term of supervised release of up to three years, and may impose a fine of up to $250,000, as to each count. On Counts 5 and 6, the Court may impose a maximum sentence of up to 20 years' imprisonment to be followed by a term of supervised release of up to 3 years, and may impose a fine of up to $250,000, as to each count. The defendant also understands that, in addition to any terms of imprisonment and supervised release and/or any fine that is imposed, the Court may order her to pay restitution to any victim of her offenses, as required by law. The defendant also understands and acknowledges that a violation of the terms of her supervised release can result in additional criminal penalties.

5.        Special Assessment: The defendant further understands and acknowledges that, in addition to the sentence imposed under paragraph 4 of this Agreement, a special assessment in the amount of $100 as to each count of conviction will be imposed on each offense to which the defendant is pleading guilty for a total special assessment in the amount of $400. The defendant also agrees that any special assessment imposed shall be paid at the time of sentencing.

6. Applicability of Sentencing Guidelines: The defendant is aware that the sentence will be imposed by the Court after considering the Federal Sentencing Guidelines and Policy Statements (hereinafter "Sentencing Guidelines"). The defendant acknowledges and understands that the Court will compute an advisory sentence under the Sentencing Guidelines and that the applicable guidelines will be determined by the Court relying in part on the results of a Pre-Sentence Investigation conducted by the Court's Probation Office, which investigation will commence after the entry of the defendant's guilty plea. The defendant is also aware that, under certain circumstances, the Court may depart from the advisory sentencing guideline range that it has computed, and may raise or lower that advisory sentence under the Sentencing Guidelines. The defendant further understands that the Court is required to consider the advisory guideline range determined under the sentencing guidelines, but is not bound to impose that sentence; the Court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines' advisory sentence. Knowing these facts, the defendant understands and acknowledges that the Court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offenses identified in paragraph 1 and that the defendant cannot withdraw her guilty plea solely as a result of the sentence imposed.

7. Rights Waived by Pleading Guilty: The defendant understands that by pleading guilty, she knowingly and voluntarily waives the following rights:

    a.     the right to plead not guilty and to persist in a plea of not guilty;

  b. the right to a speedy and public trial before a jury of her peers;

  c. the right to the effective assistance of counsel at trial, including, if the defendant could not afford an attorney, the right to have the Court appoint an attorney for the defendant;

  d. the right at trial to be presumed innocent until guilt has been proven beyond a reasonable doubt by the United States;

  e. the right at trial to confront and cross-examine witnesses against the defendant;

  f. the right to compel or subpoena the testimony of witnesses and other evidence to present at trial;

  g. the right at trial to testify or to remain silent, and the right that such silence could not be used against the defendant;

  h. the right to challenge the sufficiency of the Indictment; and

  i. the right to appeal any pretrial rulings or findings of guilt.

  8. Government's Right to Disclose Information to the Court: The Office of the United States Attorney for the Southern District of Florida (hereinafter "Office") reserves the right to inform the Court and the Probation Office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning the defendant and the defendant's background. Subject only to the express terms of any agreed-upon sentencing recommendations contained in this Agreement, this Office further reserves the right to make any recommendation as to the quality and quantity of punishment.

9. Acceptance of Responsibility: The United States and the defendant agree that, although not binding on the Probation Office or the Court, they will jointly recommend that the Court reduce by two levels the sentencing guideline level applicable to the defendant's offense, pursuant to Section 3E1.1 of the Sentencing Guidelines, based upon the defendant's recognition and affirmative acceptance of personal responsibility. If at the time of sentencing the defendant's offense level is determined to be 16 or greater, and the defendant complies with the requirements of Section 3E1.1, the government will make a motion requesting an additional one level decrease pursuant to Section 3E1.1(b) of the Sentencing Guidelines, stating that the defendant has assisted authorities in the investigation or prosecution of her own misconduct by timely notifying authorities of her intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently.

10. Limitations on Joint Sentencing Recommendations: The defendant understands and agrees that the United States will not be required to make the motions and sentencing recommendations set forth in paragraph (9) if the defendant: (i) fails or refuses to make a full, accurate and complete disclosure to the Probation Office of the circumstances surrounding the relevant offense conduct; (ii) is found to have misrepresented facts to the government prior to entering this plea agreement; or (iii) commits any misconduct after entering into this plea agreement, including but not limited to, committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official.

11.     Factual Proffer: The defendant, her counsel, and the United States further agree that, had this case proceeded to trial, the United States would have introduced the following evidence, which is sufficient to support a guilty plea and proves beyond a reasonable doubt that the defendant is guilty of Counts 1, 3, 5 and 6 of the Indictment:

Sometime in late 2007 or early 2008, the defendant Veronica Martinez, while living in the United States, learned that a Honduran national (referred to herein as "E.M."), wanted to come to the United States. Soon thereafter, the defendant spoke with E.M.'s mother in Honduras and offered to assist E.M. in coming to the United States illegally. Specifically, the defendant offered to pay a Mexican alien smuggler, known as a "coyote," to smuggle E.M. across the United States border from Mexico. The defendant stated that she would pay the coyote up front and E.M. would be responsible for paying her back. At the conclusion of the conversation, the defendant stated that she would make the smuggling arrangements and contact E.M. or her mother in the future.

Over the course of the next several months, the defendant spoke numerous times by phone to E.M. and her mother about the smuggling plans. During those conversations, the defendant stated that E.M. would owe the defendant $3,500 to be smuggled into the United States. The defendant also stated that after E.M. arrived in the United States, E.M. would re-pay the debt by cleaning homes and providing child care services. E.M. and her mother agreed to the arrangements.

In October 2008, the defendant called E.M. and told her that the plans were in place. She instructed E.M. to go to Chapas, Mexico to meet with the coyote. E.M. complied with the defendant's instructions. After arriving in Chapas, E.M. found the

8

coyote. Over the course of the next several days, E.M. lived with other persons who were also waiting to be smuggled into the United States. On October 31, 2008, E.M. was discovered by U.S. Customs and Border Protection Officers attempting to illegally cross the United States border from Mexico. E.M. was held in immigration custody for approximately one to two months pending deportation back to Honduras.

While E.M. was in immigration custody, the defendant contacted E.M.'s mother and informed her that E.M. was being held in immigration custody in the United States. Around that time, E.M.'s sister (referred herein as "L.M.") decided that she too wanted to come to the United States. The defendant offered to assist L.M. by paying the coyotes to smuggle L.M. into the United States as well. Sometime later, the defendant informed L.M.'s mother that the initial cost for L.M.'s passage into the United States was $2,500.

In or around November 2008, E.M. was deported back to Honduras. Soon thereafter, the defendant demanded that E.M. make another attempt to come to the United States illegally. The defendant stated that she would lose the money she paid the coyotes for the initial trip unless E.M. attempted to cross again. E.M. stated that she did not want to return to the United States and offered to work in Honduras to pay off her debt. The defendant rejected this offer, stating that E.M. would never be able to pay her back unless she came to the United States. The defendant also threatened to get the money from E.M.'s mother if E.M. did not come to the United States. Over the next several months, the defendant telephoned E.M. and her mother on numerous occasions, demanding that E.M. come to the United States so she could repay her debt.

9

In the Spring of 2009 with the help of the defendant, L.M. was smuggled into the United States from Mexico and brought to the defendant at Casa del Monte trailer park in West Palm Beach, Florida. The defendant paid the delivery person an additional $500 for L.M.'s passage from Texas to West Palm Beach. The defendant told L.M. that L.M. was going to be living with the defendant in a three bedroom trailer. L.M. soon discovered that the defendant's boyfriend, later identified as Jose Tomas Begas; another woman named "Adrianna"; and the defendant's four children, ages 8 to 17, were also living in the trailer. The defendant told L.M. that in addition to the $3,000 smuggling debt she would also have to pay $300 per month in rent.

The day after L.M.'s arrival, the defendant informed L.M. that she was going to work at a local bar, later identified as El Alacran in Palm Beach County. The defendant provided L.M. with tight-fitting, sexually provocative clothing and make-up and instructed her to put on the clothes and make-up. The defendant told L.M. that her job was to talk, dance and drink with the male customers in the bar. The defendant instructed L.M. to charge customers $5 per dance and $5 per drink. When L.M. told the defendant that she did not want to work at the bar, the defendant told her that there was no other work available and that L.M. needed to pay her smuggling debt.

During her first night of work, several customers attempted to touch L.M. on her breasts and between her legs. When L.M. objected, the defendant became angry and told her that she had to work to pay back the money she owed. The defendant also told L.M. that if she didn't pay her debt, then L.M.'s mother would have to pay it. Sometime later, L.M. relented and allowed the customers to touch her. LM would have

10

testified that the reason she allowed the customers to touch her is because she did not want her mother to have to pay her debt, which she could not afford.

L.M. worked at the bar every Thursday through Sunday night. On Thursdays and Sundays, the defendant worked from approximately 8:00 or 9:00 p.m. to 5:00 a.m. On Friday and Saturday nights, she worked from 6:00 p.m. to 5:00 a.m. The defendant was always present at the bar and watched L.M. dancing and interacting with the male customers. LM would have testified that while the male customers groped her breasts and between her legs, the defendant was watching. L.M. would also have testified that on multiple occasions she told the defendant that she did not want to be touched by the customers, but the defendant told her that she had to pay back the money she owed.

On or about June 1, 2009, the defendant began to give L.M. receipts memorializing money that L.M. gave the defendant to pay off her smuggling debt. These receipts did not include money that L.M. gave the defendant for living expenses, such as rent or water bill payments. The receipts were limited to only that portion of L.M.'s payments that the defendant decided would go towards the smuggling debt. Some of the receipts were bank deposits receipts that the defendant gave L.M. after the defendant deposited L.M.'s payments in the bank. Other receipts were checks or savings account bank slips that the defendant used to handwrite notations regarding payments made by L.M. The defendant signed many of these receipts acknowledging payments made by L.M. Prior to the issuance of the first receipt, L.M. had made numerous payments to the

11

defendant towards her smuggling debt and daily living expenses that were not memorialized in writing.

In or around July 2009, E.M. was smuggled into the United States from Mexico and turned over directly to the defendant in Florida. The defendant told E.M. that she too would be living with the defendant, the defendant's boyfriend, the defendant's children, and L.M. at the trailer in West Palm Beach. The following day, the defendant informed E.M. that she too would be working at El Alacran to earn back the money she owed to the defendant. The defendant provided E.M. with high heels and tight-fitting, sexually provocative clothing and make-up which she instructed E.M. to put on.

The defendant then transported E.M. to the bar and instructed her to talk, dance, and drink with the male customers. She also told E.M. to smile, be friendly and sit on the laps of the customers. The defendant instructed E.M. to charge customers $5 per dance and $5 per drink. The defendant stated that if E.M. violated these rules, E.M. would "get in trouble." The defendant also instructed E.M. to get the male customers' cellular telephone numbers so that they could call clients at a later time.

E.M. worked at the bar with her sister from Thursday to Sunday nights. The defendant was always present at the bar and watched E.M.'s interactions with the male customers. On numerous occasions, male customers fondled E.M.'s breasts and touched her between her legs. If E.M walked away from a male customer, the defendant would remind E.M. that she was not going to make any money if she did not interact with the customers.

E.M. and L.M. earned a base salary of $150 per week from the bar owner, and approximately $60 to $100 per night in tips from the customers. At the end of each shift, the defendant forced E.M. and L.M. to turn over all the money they had earned, informing them that the money would be used to pay their daily living expenses and smuggling debts. Approximately one week after E.M. started working, the defendant informed both E.M. and L.M. that they owed her a combined total of $12,000. The defendant did not explain why the amount of the smuggling debt had increased.

In or around the end of the summer of 2009, E.M. contacted a friend from Texas who came to Florida to pick her up. E.M. fled to Texas with the intent to return to Honduras. Soon after she left, the defendant contacted E.M.'s mother and threatened to get from her the money that E.M. owed. The defendant also contacted E.M. by phone and demanded that E.M return to Florida. The defendant also told L.M. that she would beat E.M. when E.M. returned. As a result of the defendant's threats, E.M. returned to Florida.

After working for some time at El Alacran, L.M. asked the defendant if she could get another job doing such duties as cleaning houses or working in a restaurant. The defendant said no and told her that she had to work at the bar. She also said that once L.M. paid back her debt, she could do whatever she wanted, but not until she paid back her entire debt.

In or around October 2009, E.M. ran away with her boyfriend. When the defendant learned that E.M. had left, she became angry. When the defendant later spoke to E.M. by phone, the defendant demanded repayment of the debt. The defendant also

threatened to get E.M.'s portion of the debt from L.M. or her. As a result of the defendant's threats, E.M. felt she had no choice but to return to the defendant.

In or around January 2010, E.M. discovered that she was pregnant. The defendant told E.M. not to let the club know that she was pregnant or they would not allow her to work there. E.M. continued to work at the bar despite being pregnant. Initially, E.M. only drank water at the bar. When the defendant found out she was only drinking water, she became angry and told E.M. that she would not earn enough money to pay her back if she did not drink alcohol with the customers. The defendant encouraged E.M. to drink alcohol despite being pregnant.

In or around February 2010, El Alacran closed down. The defendant then arranged for E.M. and L.M. to work at another local bar called El Rancho. The defendant instructed the women that they were to work in the same fashion as they had done at El Alacran. When the manager of El Rancho found out that E.M. was pregnant, E.M got fired. The defendant became angry and told E.M that she now could not make any money to pay back her debt. The defendant then told L.M. that since E.M could no longer work to pay back her smuggling debt, L.M. was now responsible for E.M.'s debt as well as her own.

After E.M. stopped working at El Rancho, the defendant continued to contact her demanding that E.M. pay her debt. On March 23, 2010, after E.M. and L.M. were in protective custody, the defendant left a voicemail message on E.M.'s cell phone demanding her money. Specifically, the defendant stated that she didn't care if E.M. had to "rob a bank" to pay her back.

14

On March 24, 2010, agents from the Federal Bureau of Investigation arrested the defendant at her residence. Law enforcement provided the defendant with her *Miranda* warning in Spanish. The defendant waived her right to remain silent and agreed to speak with law enforcement. In a subsequent videotaped interview, the defendant admitted that she arranged for E.M. and L.M. to be smuggled illegally into the United States through the use of a coyote. She admitted that when E.M. and L.M. arrived into the United States, she put them to work at night clubs in West Palm Beach so they could pay back their smuggling debt to her. She admitted that she threatened to get the money from the women's mother or use the legal process against them if the women did not repay their debt.

12. Waiver of Right to Appeal: The defendant is aware that Title 18, United States Code, Section 3742 affords the defendant the right to appeal the sentence imposed in this case. Acknowledging this, in exchange for the undertakings made by the United States in this plea agreement, the defendant hereby waives all rights conferred by Section 3742 to appeal any sentence imposed, including any restitution order, or to appeal the manner in which the sentence was imposed, unless the sentence exceeds the maximum permitted by statute or is the result of an upward departure and/or a variance from the guideline range that the court establishes at sentencing. The defendant further understands that nothing in this agreement shall affect the government's right and/or duty to appeal as set forth in Title 18, United States Code, Section 3742(b). However, if the United States appeals the defendant's sentence pursuant to Section 3742(b), the defendant shall be released from the above waiver of appellate rights. By signing this agreement,

the defendant acknowledges that she has discussed the appeal waiver set forth in this agreement with her attorney. The defendant further agrees, together with the United States, to request that the district court enter a specific finding that the defendant's waiver of her right to appeal the sentence to be imposed in this case was knowing and voluntary.

13. No Promises or Representations Regarding Ultimate Sentence: The defendant is aware that the sentence has not yet been determined by the Court. The defendant also is aware that any estimate of the probable sentencing range or sentence that the defendant may receive, whether that estimate comes from the defendant's attorney, the government, or the probation office, is a prediction, not a promise, and is not binding on the government, the probation office or the Court. The defendant understands further that any recommendation that the government makes to the Court as to sentencing, whether pursuant to this agreement or otherwise, is not binding on the Court and the Court may disregard the recommendation in its entirety. The defendant acknowledges that no one has promised or guaranteed what sentence the Court will impose. The defendant understands and acknowledges, as previously acknowledged in paragraph 6 above, that the defendant may not withdraw her plea based upon (a) the Court's decision not to accept a sentencing recommendation made by the defendant and/or the government, or (b) the fact that she received an incorrect estimate of the sentence that she would receive, whether that estimate came from her attorney, the United States, and/or the Probation Office. The defendant also understands that the government may seek any applicable sentencing enhancements, including but not limited to the cross reference set forth in Section 2H4.1(b)(4) of the Sentencing Guidelines. The

defendant also understands that the government may present testimony at the sentencing proceedings from witnesses to establish the application of any sentencing enhancement, including the cross reference set forth above.

14. Voluntariness of Plea: The defendant agrees that she has entered into this plea Agreement freely and voluntarily, and that no threats or promises, other than the promises contained in this written Plea Agreement, were made to induce the defendant to enter her plea of guilty.

15. Entire Agreement: This is the entire agreement and understanding between the United States and the defendant. There are no other agreements, promises, representations, or understandings. This Agreement binds only the United States Attorney's Office for the Southern District of Florida. It does not bind any other United States Attorney's Office, or any other office or agency of the United States, or any state or local prosecutor.

WIFREDO A. FERRER
UNITED STATES ATTORNEY

Date: 7/23/10    By: _____
MARK DISPOTO
ASSISTANT UNITED STATES ATTORNEY

Date: 7/22/2010  By: _____
VERONICA MARTINEZ
DEFENDANT

Date: 7/22/2010  By: _____
LORI BARRIST, ESQUIRE
ATTORNEY FOR DEFENDANT

Translated into Spanish on 7/22/2010 by U.S. Court certified interpreter Ana Shore

17